# In the United States Court of Federal Claims

No. 12-209C
Filed: February 25, 2016

```
*******************************************
                                          *
HOUSING AUTHORITY OF THE COUNTY           *
OF SANTA CLARA,                           *
                                          *
        and                               *
                                          *
HOUSING AUTHORITY OF THE CITY OF          *
SAN JOSE,                                 *
                                          *
        Plaintiffs,                       *
                                          *
v.                                        *
                                          *
THE UNITED STATES,                        *
                                          *
        Defendant.                        *
                                          *
*******************************************
```

28 U.S.C. § 1491(b)(1)
   (Tucker Act Jurisdiction);
42 U.S.C. § 1437f
   ("Section 8");
Consolidated Appropriations Act, 2008,
   Pub. L. No. 110-161, 121 Stat. 1844,
   2410–2440 (2007);
Omnibus Appropriations Act, 2009,
   Pub. L. No. 111-8, 123 Stat. 524,
   952–958 (2009);
Omnibus Consolidation Rescissions &
   Appropriations Act of 1996, Pub. L.
   No. 104-134, 110 Stat. 1321 (1996);
RESTATEMENT (SECOND) OF CONTRACTS
   §§ 23 cmt. b, 154, 178, 204,
   214 cmt. d (1981);
Rules of the United States Court of
   Federal Claims ("RCFC")
   56(c) (Summary Judgment).

**Carl A. S. Coan, III**, Coan & Lyons, Washington, D.C., Counsel for Plaintiffs.

**Jeffrey D. Klingman**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**BRADEN**, *Judge*.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

In 1937, Congress authorized public housing agencies ("PHAs") to administer public tenant-based housing programs under Section 8 of the United States Housing Act of 1937

---

[1] The relevant facts were derived from: Plaintiffs' March 30, 2012 Complaint ("Compl.") and attached Exhibits ("Compl. Exs. 1–2"); the September 2, 2014 Declaration of Carl A.S. Coan, III ("9/2/14 Coan Dec.") and attached Exhibits 1–15 ("9/2/14 Coan Dec. Exs. 1–15"); the September 2, 2014 Declaration of Alex Sanchez ("9/2/14 Sanchez Dec.") and attached Exhibits A–E ("9/2/14 Sanchez Dec. Exs. A–E"); the Government's December 1, 2014 Response Appendix

("Section 8").  *See* 42 U.S.C. § 1437f(b)(1) ("The Secretary [of The United States Department of Housing and Urban Development ("HUD")] is authorized to enter into annual contributions contracts with [PHAs,] pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section."). Section 8 also authorizes PHAs to distribute funds through the Housing Choice Voucher Program ("HCVP").  *See* 42 U.S.C. § 1437f(o) (discussing the HCVP).[2]

Since at least 1976, the Housing Authority of the County of Santa Clara ("Santa Clara") and the Housing Authority of the City of San Jose ("San Jose") have been PHAs and administered Section 8 public housing rental assistance to low-income families in Northern California.  *See* 42 U.S.C. § 1437a(b)(6)(A);[3] s*ee also About HACSC*, HOUSING AUTHORITY OF THE COUNTY OF SANTA CLARA, www.hacsc.org/about-hacsc (last visited Feb. 24, 2016).

In 1996, Congress authorized HUD to implement the Moving To Work ("MTW") Program[4] to afford PHAs "the flexibility to design and test various approaches for providing and

_____

("Gov't App. A1–A340"); Plaintiffs' January 26, 2015 Reply Appendix ("Pls. App. A1–A106"); and the September 29, 2015 Oral Argument ("9/29/15 TR 1–72").

[2] HUD's website states that "[t]he housing choice voucher program is the federal [G]overnment's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market." *Housing Choice Vouchers Fact Sheet*, HUD.GOV, http://portal.hud.gov/hudportal/HUD?src=/program_offices/ public _indian_housing /programs/hcv/about/fact_sheet (last visited Feb. 24, 2016).

[3] Section 1437a(b)(6)(A) of the United States Housing Act of 1937 provides:

Except as provided in subparagraph (B), the term "public housing agency" means any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing, or a consortium of such entities or bodies as approved by the Secretary.

42 U.S.C. § 1437a(b)(6)(A).

[4] HUD's website states:

[MTW] is a demonstration program for [PHAs] that provides them the opportunity to design and test innovative, locally-designed strategies that use Federal dollars more efficiently, help residents find employment and become self-sufficient, and increase housing choices for low-income families.  MTW gives PHAs exemptions from many existing public housing and voucher rules and more flexibility with how they use their Federal funds. MTW PHAs are expected to use the opportunities presented by MTW to inform HUD about ways to better address local community needs.

*Moving to Work (MTW)*, HUD.GOV, http://portal.hud.gov/hudportal/HUD?src=/program_ offices /public_indian_housing/programs/ph/mtw (last visited Feb. 24, 2016).

administering housing assistance that[] reduce cost and achieve greater cost effectiveness in Federal expenditures[.]"  *See* Omnibus Consolidated Rescissions & Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-281 (1996).

In 2003, Congress enacted legislation requiring that PHA funding be calculated annually by a formula that has two components: (1) leasing & cost data; and (2) a rent and utility inflation factor, known as the Annual Adjustment Factor ("AAF").[5]  *See* Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 484 (2003).

In 2005, however, Congress enacted new legislation, adding a "proration factor" to the funding formula, requiring HUD to adjust each PHA's eligibility amount to comply with, but not exceed, annual congressional appropriations.[6]  *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3295 (2004) ("2005 Act").[7]  Therefore, from 2005 to the present, HUD's general funding formula has been:  (leasing & cost data) x AAF x the "applicable proration factor."  But, the 2005 Act exempted PHAs participating in the MTW program from this funding formula.  Instead, "[PHAs] participating in the [MTW] demonstration *shall be funded pursuant to their [MTW] agreements **and** shall be subject to the same pro rata adjustments under the previous proviso*[.]"  118 Stat. at 3295 (emphasis and bold added).

In late 2007, Santa Clara and San Jose engaged in discussions with HUD about entering into MTW Agreements.  9/2/14 Sanchez Dec. Ex. B, at 2.  The formula for calculating their subsidies was to be set forth in an attachment.  HUD forwarded Santa Clara and San Jose the Attachment A to the MTW agreement executed by a PHA in Charlotte, North Carolina in 2007 (the "Charlotte Model").

---

[5] HUD annually determines the AAF for geographical areas and publishes it in the *Federal Register*.  *See* 42 U.S.C. § 1437f(c)(1)–(2); *see also Annual Adjustment Factors*, HUD.GOV, www.huduser.org/portal/datasets/aaf.html (last visited Feb. 24, 2016).

[6] For example, if annual congressional appropriations would exceed total eligibility, the "proration factor" is positive (over 100 percent), so that a PHA receives a HAP subsidy in an amount that exceeds its eligibility amount.  Gov't App. A268.  But, if congressional appropriations are less than total eligibility, the "proration factor" is negative (under 100 percent), so that a PHA would receive a HAP subsidy in an amount below its eligibility.  Gov't App. A267.  To date, the only years where the "proration factor" was positive were 2007 and 2008.  Gov't App. A290.

[7] The 2005 Act, in relevant part, also provides that "the Secretary shall, to the extent necessary to stay within the amount provided under this paragraph, pro rate each public housing agency's allocation otherwise established pursuant to this paragraph[.]"  118 Stat. at 3295.

Paragraph C3 of Attachment A to the Charlotte Model provided:

> 3.  Initial year (CY 2007) subsidy will be based on the HCVP subsidy received by the Agency in the Base Year (CY 2006).  In the Base Year (CY 2006), the HCVP funding eligibility for Housing Assistance Payment (HAP), prior to *proration*,[8] totaled $34,742,786.

Gov't App. A240 (emphasis added).

On December 26, 2007, Santa Clara and San Jose rejected the Charlotte Model Attachment A, because their HAP subsidy would be based on "eligibility," which was a lesser amount,[9] and sent HUD an alternative Paragraph C3 that read:

> 3. Initial year (CY 2008) HCVP subsidy will be based on the HCVP subsidy received by the Agency in the Base Year (CY 2007).  In the Base Year (CY 2007), the HCVP totaled $129,091,872.

Gov't App. A31; *see also* Gov't App. A67 (same re. San Jose).

This proposal reflected that Santa Clara and San Jose wanted to base their initial year HAP subsidy on the amount they "received" from HUD in 2007, so that the 2008 HAP subsidy would not be determined by "eligibility."  When Santa Clara and San Jose forwarded their December 26, 2007 proposal to HUD, they pointed out: "As you discussed with our representatives, the enclosed [MTW] Agreements follow the HUD template exactly. . . .  As generally instructed by your staff, Attachment A (the funding exhibit) follows the Charlotte [M]odel we were provided, *with some refinements*."  Gov't App. A16 (emphasis added).

---

[8] HUD defined "proration" as the percentage of the Total Eligibility that would be funded for and paid to the PHA for CY 2007 renewal needs.  The percentage is identical for all PHAs and is the result of dividing the total renewal funding available . . . by the sum of the Total Eligibility amounts for all PHAs.  For 2007, the pro-ration factor is 105.017 percent, which means that each PHA will *receive* funding equal to 105.017 percent of its Total Eligibility.  9/2/14 Coan Dec. Ex. 13, at 10 (emphasis added).

[9] This is because "eligibility" is determined prior to HUD applying the proration factor. 9/2/14 Coan Dec. Ex. 13, at 2–4 (HUD letter to all PHA Executive Directors and attached worksheet for Santa Clara); *see also* Court Exhibits A and B.

On January 15, 2008, HUD proposed an alternative Paragraph C3 of Attachment A that read:

3. Initial Year (CY 2008) HCVP housing assistance payments (HAP) subsidy will be based on the actual HAP expenses incurred by the Agency in the base period (FFY2007).

Gov't App. A131. Santa Clara and San Jose also rejected this proposal.[10]

On February 12, 2008, HUD forwarded a third alternative Paragraph C3 that read:

3. Initial Year (CY 2008) HCVP subsidy will be based on **the greater of** actual HAP expenses incurred by the Agency as reported in the Voucher Management System (VMS) in the base period (FFY 2007) **or** what the Agency received in calendar year 2007.

Pls. App. A61–62 (emphasis and bold added). Santa Clara and San Jose accepted this version of Paragraph C3.

On February 26, 2008, Santa Clara and San Jose executed the MTW Agreements with HUD that included the February 12, 2008 version of Paragraph C3 of Attachment A. Compl. Exs. 1, 2.[11]

But, on June 10, 2008, HUD informed Santa Clara and San Jose that their 2008 HAP subsidy would be "based on [their] 2007 eligibility, rather than on re-benchmarking." 9/2/14 Coan Dec. Ex. 5, at 2. Santa Clara's 2007 "eligibility" was determined to be $122,924,735, as adjusted by the AAF). Gov't App. A14. San Jose's 2007 "eligibility" was $82,860,836, as adjusted by the AAF. Gov't App. A15. These eligibility amounts were significantly lower than the HAP subsidy that Santa Clara and San Jose actually received from HUD in 2007, *i.e.*, $129,091,869 for Santa Clara and $87,017,964 for San Jose. Gov't App. A14, A15.

On June 17, 2008, Santa Clara and San Jose sent an email to HUD objecting. 9/2/14 Coan Dec. Ex. 9, at 3. That same day, HUD advised Santa Clara that "legal determination" had been made, concluding that the February 12, 2008 version of Paragraph C3 of Attachment A contained a "drafting error." 9/2/14 Sanchez Dec. Ex. E, at 3.

---

[10] Because Santa Clara did not spend the entire amount of its 2007 HAP subsidy, it rejected HUD's proposal to use "actual HAP expenses" as the basis for determining the HAP subsidy for the initial year. Gov't App. A332–33.

[11] The Executive Director of Santa Clara signed one MTW Agreement for Santa Clara and a separate, but identically worded MTW Agreement on behalf of San Jose. Compl. Ex. 1, at 15; Compl. Ex. 2, at 15. The Assistant Secretary of HUD signed both of these MTW Agreements, but backdated his signature to January 4, 2008. Compl. Ex. 1, at 15; Compl. Ex. 2, at 15.

## II.     RELEVANT PROCEDURAL HISTORY.

On March 30, 2012, Santa Clara and San Jose (collectively, hereinafter "Plaintiffs") filed a Complaint in the United States Court of Federal Claims alleging two counts of breach of contract. Count One alleges a breach of contract in 2008.  Count Two concerns a breach of contract in 2009 through 2012.  This case was assigned to the Honorable Lawrence Margolis.  On July 31, 2012, the Government filed an Answer.  On October 18, 2012, the court entered a Discovery Scheduling Order.

On August 29, 2013, the case was reassigned to the undersigned judge.  On September 30, 2013, the court convened a telephone status conference with the parties and entered a revised Discovery Scheduling Order on October 2, 2013.  On May 5, 2014, the parties submitted a Joint Status Report and the court entered another Scheduling Order.  On September 2, 2014, Plaintiffs filed a Motion For Summary Judgment ("Pls. SJ Mot.").[12]  On December 1, 2014, the Government filed a Response ("Gov't Resp.").  On January 26, 2015, Plaintiffs filed a Reply ("Pls. Reply"). On September 29, 2015, the court held Oral Argument at the United States Court of Federal Claims ("9/29/15 TR 1–72").  On December 4, 2015, Plaintiffs submitted a supplemental brief requested by the court ("Pls. Supp. Br.").  The Government also filed a supplemental brief that same day ("Gov't Supp. Br.").

## III.    DISCUSSION.

### A.     Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . .  [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, Plaintiffs must identify and plead a constitutional provision, federal statute, executive agency regulation and/or an independent contractual relationship that provides a substantive right to money damages. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate

---

[12] In the September 2, 2014 Motion For Summary Judgment, Plaintiffs seek leave to amend the March 30, 2012 Complaint to include breach of contract claims for 2013 and 2014.  Pursuant to Rule 15(a)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), the court grants Plaintiffs leave to amend the March 30, 2012 Complaint.  As such, this Memorandum Opinion adjudicates Plaintiffs' breach of contract claims for the years 2008 through 2014.

source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, Plaintiffs must demonstrate that the source of substantive law upon which they rely "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 607 (1967)).

> The gravamen of the March 30, 2012 Complaint is summarized as follows:
>
> HUD's failure to provide HAP to Plaintiffs based on the 2007 prorated amount in 2008 was a breach of the [MTW] Agreements.
>
> HUD has also breached the [MTW] Agreements every year since 2008. This is because the HAP funding after 2008 is based on the previous year's HAP eligibility. Therefore, the effect of HUD's underfunding in 2008 has been perpetuated annually since 2008 and reduced the HAP to which Plaintiffs have been entitled in each year since 2008.

Pls. SJ Mot. at 18.

Therefore, the court has jurisdiction to adjudicate the breach of contract claims alleged in the March 30, 2012 Complaint.

## B.    Standard Of Review.

On a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Amergen Energy Co. v. United States*, 779 F.3d 1368, 1372 (Fed. Cir. 2015) ("Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting RCFC 56(a))). Only genuine disputes of material fact that affect the outcome of the suit preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247–48 (emphasis in original). "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Because the Government is "a party opposing a properly supported motion for summary judgment, [it] . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

## C.    Whether Plaintiffs Are Entitled To Summary Judgment As To Count I.

Count I of the March 30, 2012 Complaint alleges that HUD breached the February 26, 2008 MTW Agreements by incorrectly calculating the amount of HAP subsidies to which Plaintiffs were entitled to receive in 2008.

### 1.    Plaintiffs' Argument.

Plaintiffs argue that they are entitled to summary judgment as to Count I, because Paragraph C3 of Attachment A to the MTW Agreements provides that the initial year of the HAP subsidy, *i.e.*, 2008 can be based on either "actual HAP expenses" incurred in 2007 or the amount that Santa Clara and San Jose "received" in calendar year 2007, whichever is greater.  Pls. SJ Mot. at 18.

Plaintiffs emphasize that the word "received" in Paragraph C3 of Attachment A to the MTW Agreements is not ambiguous, because the plain meaning of the word "received" "could not be clearer and neither creative semantical arguments nor evidence of practice, custom, and usage can alter the unequivocal import of this word."  Pls. SJ Mot. at 18.

In the alternative, if "the [c]ourt determines that the word 'received' . . . is ambiguous, this ambiguity was latent, not patent . . . [so that] the [c]ourt should construe the language . . . against HUD" under the doctrine of *contra proferentem*.  Pls. SJ Mot. at 18–19.

### 2.    The Government's Response.

The Government responds that Plaintiffs are not entitled to summary judgment as to Count I, because Paragraph C3 of Attachment A to the MTW Agreements is "susceptible to more than one reasonable meaning."  Gov't Resp. at 25–26.  First, the parties did not discuss whether "what the [Plaintiffs] received in calendar year 2007 *could* refer to a pre-proration or post-proration amount."  Gov't Resp. at 26 (emphasis added) (internal quotations omitted); *see also* 9/25/15 TR at 7.  Second, the parties' intent regarding the meaning of "what the [Plaintiffs] received in calendar year 2007" differed.  Gov't Resp. at 26–27.  Third, Plaintiffs concede that the term "received" is ambiguous, because Paragraph C3 did not specify a dollar amount.  Gov't Resp. at 27–28.

To resolve this ambiguity, the court must determine whether "[P]laintiffs knew or should have known of HUD's interpretation of the [MTW] [A]greements."  Gov't Resp. at 28.  "It is 'an unassailable rule of contract law' that 'a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that interpretation.'"  Gov't Resp. at 28 (quoting *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1335 (Fed. Cir. 2004)).  Plaintiffs were "aware that HUD would be adopting an interpretation that did not include the proration in the base year.  If that is the case, then HUD's interpretation must prevail."  Gov't Resp. at 29.

In addition, because Paragraph C3 is ambiguous, the court must consider extrinsic evidence, precluding summary judgment.  Gov't Resp. at 29 (quoting *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution.")).  And, even if any ambiguity is latent, summary judgment is still inappropriate, because the court may adopt Plaintiffs' interpretation "only if [Plaintiffs'] interpretation is reasonable."  Gov't Resp. at 29 (citing *BPLW Architects & Eng'rs, Inc. v. United States*, 106 Fed. Cl. 521, 537 (2012) ("If . . . a party makes an arguable claim that a contract provision contains a latent ambiguity, courts may resort to extrinsic evidence to determine whether a latent ambiguity actually exists.")).

Finally, the doctrine of *contra proferentem* is inapplicable, because the MTW Agreements were "the product of significant negotiation between the parties, and formulation using the word

'received' came in the initial draft written by the [P]laintiffs." Gov't Resp. at 30–31 (citing *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 330 (1999) ("[W]hen the contract terms are negotiated, *contra proferentem* is inapplicable.")).

In the alternative, the Government argues that, even if the MTW Agreements are unambiguous, there is a genuine issue of material fact as to whether there was a unilateral mistake, because HUD "never would have entered into a contract[,] building in a proration into the base year." Gov't Resp. at 34 (citing RESTATEMENT (SECOND) CONTRACTS § 214 cmt. d (1981)) ("RESTATEMENT").[13]   In addition, "[i]t would be unconscionable to award the [P]laintiffs the windfall they seek through building a proration into their base year." Gov't Resp. at 35.

### 3.      Plaintiffs' Reply.

Plaintiffs reply that evidence of the parties' intent prior to the execution of the February 28, 2008 MTW Agreements is inadmissible, because the text of the MTW Agreements is unambiguous. Pls. Reply at 10 ("Plaintiffs and [the Government] may have different perspectives on the events leading up to the execution of the [MTW] Agreements. However, . . . it doesn't matter who said what or who heard what. The [MTW] Agreements are unambiguous on their face."). In the alternative, if the court finds that the MTW Agreements are ambiguous, any ambiguity is latent and must be construed against HUD. Pls. Reply at 16–18.

Plaintiffs add that they had no knowledge of the Government's "alleged mistake." Pls. Reply at 19. Moreover, "unconscionability is usually between the contracting parties. There's no unconscionability as to HUD . . . [and] third party unconscionability . . . [has] never been recognized by any court decision." 9/29/15 TR at 58; *see also* Pls. Reply at 19–20. Therefore, the doctrine of unilateral mistake does not apply in this case. Pls. Reply at 19.

### 4.      The Court's Resolution.

#### a.      Whether Paragraph C3 Of Attachment A To The February 26, 2008 Moving To Work Agreements Is Ambiguous.

In *Massie v. United States*, 166 F.3d 1184, 1189 (Fed. Cir. 1999), the United States Court of Appeals for the Federal Circuit held that the court should interpret a contract:

---

[13] Comment d of Section 214 of the RESTATEMENT provides:

*Remedies.* A contract which is fully enforceable in an action for damages may be subject to equitable remedies such as rescission or reformation by reason of fraud, mistake or the like. Specific performance may be denied by reason of oppression or unfairness, or other remedies may be withheld or limited where the contract or a term is unconscionable. Evidence of the circumstances in which the contract was made may be relevant to such remedial issues, even though it also shows an agreement or proposal superseded by a later integrated contract.

RESTATEMENT § 214 cmt. d (citation omitted).

begin[ning] with the plain language . . . [and] giv[ing] the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, [the court] must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. If terms are susceptible to more than one reasonable interpretation, then they are ambiguous.

*Id*. at 1189 (citation omitted).

The court's analysis begins by examining Paragraph C3 of Attachment A to the MTW Agreements:

> 3. Initial year (CY 2008) [HAP] subsidy will be based on the *greater* of actual HAP expenses incurred by the Agency…in the base period (FFY 2007) *or* what the Agency received in calendar year 2007.

Compl. Ex. 1, at 16–17 (emphasis added); Compl. Ex. 2, at 16.

The plain and ordinary meaning of Paragraph C3 is that in 2008 HUD was required to pay Plaintiffs a HAP subsidy based on either their HAP expenses or what they "received"[14] in 2007—whichever amount was greater. If the court were to construe the phrase, "what the agency received in 2007," as referring either to a pre-prorated or prorated amount, as the Government asks, there would be no certain metric by which the 2008 HAP subsidy could be determined and it would render Paragraph C3 meaningless. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) ("[The court] must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."). Moreover, it would defeat the additional purpose of Paragraph C3, which was to fix a starting point by which Plaintiffs' post 2008 HAP subsidies could be calculated. Therefore, in the context of Paragraph C3 of Attachment A to the MTW Agreements, the plain and ordinary meaning of the word "received" is the amount of HAP that HUD paid Plaintiffs in 2007, which was a prorated amount. Compl. ¶¶ 37, 49. This interpretation is also consistent with the worksheet attached to HUD's June 22, 2007 letter stating that the amount of HAP subsidy that Santa Clara would "receive" in 2007 was $129,091,869, which is a prorated amount. 9/2/14 Coan Dec. Ex. 13, at 4, 9.

As for the Government's argument that the court should look to HUD's "subjective intent" at the time the MTW Agreements were executed to determine whether Paragraph C3 is ambiguous, as a matter of law, subjective intent is prohibited by the parol evidence rule and cannot create a genuine issue of material fact. *See TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions."); *see also Banknote Corp. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and

---

[14] "Received" means "be given, presented with, or paid." NEW OXFORD AMERICAN DICTIONARY 1456 (3d ed. 2010); *see also* BLACK'S LAW DICTIONARY 1460 (10th ed. 2014) (defining "receive" as "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source[.]").

ordinary meaning; we may not resort to extrinsic evidence to interpret them."); 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.2 (3d ed. 2004) (explaining that the parol evidence rule "may bar" the use of extrinsic evidence "to contradict" the terms of a contract).

The Government also argues that Paragraph C3 is ambiguous, because it does not provide a specific dollar amount. Gov't Resp. at 24. This argument is unpersuasive, because the plain and ordinary meaning of the word "received" in Paragraph C3 refers to the actual HAP subsidy that HUD paid Plaintiffs in 2007. For Santa Clara that amount is $129,091,869; for San Jose that amount is $87,017,964. Gov't App. A14, A15. Therefore, Paragraph C3 is not ambiguous. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996) ("A contract term is unambiguous when there is only one reasonable interpretation." (citation omitted)).

In addition, the Government suggests that Paragraph C3 is ambiguous, because the phrase "based on" is imprecise in contrast with Paragraph C4 that uses the "more specific" phrase, "equal to." Gov't Resp. at 32–33; *see also* 9/29/15 TR at 11. The Government misses the point that Paragraph C3 determines *the basis* or starting point for calculating the post 2008 HAP subsidies, whereas Paragraph C4 provides the actual formula to determine the specific amount of post 2008 HAP subsidies due Plaintiffs. Compl. Ex. 1, at 16–17; Compl. Ex. 2, at 16–17. Therefore, the term "based on" does not render Paragraph C3 ambiguous.

For these reasons, the court has determined that Paragraph C3 of Attachment A to the MTW Agreements is not ambiguous.[15]

### b.        Whether There Was A Unilateral Mistake.

Recognizing the weakness of its ambiguity arguments, the Government submits that "[P]aragraph C3 [is the] likely . . . product of careless draftsmanship." Gov't Resp. at 32.

The common law doctrine of unilateral mistake provides:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

RESTATEMENT § 153.

---

[15] As such, the court does not need to determine the application of the doctrine of *contra proferentem*. *See ITT Arctic Servs., Inc. v. United States*, 207 Ct. Cl. 743, 767 (1975) ("The necessary precursor for resort to the rule of *contra proferentem* is the determination that a contract clause is ambiguous, *i.e.*, susceptible of more than one reasonable interpretation.").

A party bears the risk of a mistake when

> (a) the risk is allocated to him by agreement of the parties, or

> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

RESTATEMENT § 154.

The Government recognizes that Paragraph C3 of Attachment A to the MTW Agreements contains the word "received," the effect of which was to require Plaintiffs' 2008 HAP subsidies be based on the amount each received in 2007, which was prorated. Gov't Resp. at 14.  In light of the extensive negotiations about whether the amount of 2008 HAP subsidy would be based on a prorated amount, it certainly was reasonable for Plaintiffs to conclude that HUD agreed to calculate their 2008 HAP subsidies based on the amount Plaintiffs received in 2007, if it was greater than their actual HAP expenses.  Moreover, the Government's bald assertion that Plaintiffs misled HUD into including the term "received" is simply not substantiated in the record.  Therefore, the Government has not established either that Plaintiffs "had reason to know of the mistake or . . . caused the mistake."  RESTATEMENT § 153(b).

As to which party should bear the risk of any mistake, in this case, the dispositive factors are that HUD regularly enters into contracts with PHAs and the MTW Agreements at issue were the product of months of professional negotiations, in which HUD was actively involved.  *See, e.g.*, Gov't App. A338–40 (May 1, 2014 Vargas Deposition describing negotiations); *see also Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("A party cannot generally enter into a contract and later avoid its obligations by pleading ignorance of the terms."); RESTATEMENT § 23 cmt. b ("[W]here an offer is contained in a writing either the offeror or the offeree may, without reading the writing, manifest assent to it and bind himself without knowing its terms.").  Therefore, "the risk [of a mistake] is allocated to [HUD, because] it is reasonable in the circumstances to do so." RESTATEMENT § 154(c).

For these reasons, the court has determined that the Government has failed to establish the elements of a unilateral mistake and the Government should bear the risk of any unilateral mistake.

* * *

For these reasons, the court has determined that Plaintiffs are entitled to summary judgment as to Count I.

**D.      Whether Plaintiffs Are Entitled To Summary Judgment As To Count II.**

Count II of the March 30, 2012 Complaint alleges that HUD breached the February 26, 2008 MTW Agreements by incorrectly calculating the amount of HAP subsidies to which Plaintiffs were entitled to receive in 2009 through 2014.[16]

**1.      Whether Paragraph C4 Of Attachment A To The February 26, 2008 Moving To Work Agreements Is Ambiguous.**

**a.      Plaintiffs' Argument.**

Plaintiffs argue that they are entitled to summary judgment as to Count II, because "[t]he effect of HUD's *underfunding* in 2008 has been perpetuated annually . . . and reduced the HAP to which Plaintiffs have been entitled[.]"  Pls. SJ Mot. at 18 (emphasis added).

**b.      The Government's Response.**

The Government responds that Paragraph C4 of Attachment A to the February 26, 2008 MTW Agreements does not support an award of damages for 2009 through 2014.  Gov't Resp. at 39–40.  Specifically, "the contract[s] [are] clear that the previous year's 'eligibility' [for a HAP subsidy] is to be multiplied by the current AAF and proration factor[.]"  Gov't Resp. at 40.  As the Government's Counsel argued:

> The original formula provided by Congress and calculated by HUD was that Plaintiffs were entitled to [approximately $122 million] for Santa Clara. . . .  The only reason that they received an additional 5 percent was because proration in that particular year, CY 2007, gave them and all other PHAs an additional 5 percent of funding but only for that year. . . .  In fact . . . there has never been a year since Congress began proration in 2005 that the amount appropriated has equaled the amount calculated pursuant to the [c]ongressional formula for all PHAs.  It has always come in either lower or higher.  In 2008, it was fairly close.  It was about a 1 percent difference.  Most years it ranges between 1 and 5 percent. . . .  [T]he fact is that the amount Congress appropriates . . . has never been exactly equal to the amount that has been calculated . . . for each [PHA], that each [PHA is] eligible for.

9/29/15 TR at 37–38.  Because "'eligibility' can never include prorations from preceding years, the [P]laintiffs cannot recover any damages for 2009 to the present[.]"  Gov't Resp. at 40.

**c.      Plaintiffs' Reply.**

Plaintiffs reply that Paragraph C4 of Attachment A "unambiguously required that the HAP subsidy provided by HUD to Plaintiffs [after] the Initial Year [2008] be based on the correctly calculated Initial Year HAP subsidy eligibility amount."  Pls. Reply at 26.

---

[16] As previously stated, the court grants leave to Plaintiffs to amend the March 30, 2012 Complaint to include breach of contract claims for 2013 and 2014.

### d.   Court's Resolution.

The relevant part of Paragraph C4 of Attachment A that speaks to how the HAP subsidies will be calculated after 2008 reads:

> 4. . . . For subsequent years, the HAP subsidy will be equal to the previous year's HAP subsidy eligibility adjusted by the current year's AAF and applicable proration factor percentage.

Compl. Ex 1, at 17; Compl. Ex. 2, at 16.

The MTW Agreements do not define "subsidy eligibility" so the court again looks to the plain and ordinary meaning.[17] Read in the context of Paragraph C4, the phrase "the previous year's HAP subsidy eligibility" refers to the amount of "money" that Plaintiffs were eligible to receive in the year prior to any subsequent year, which is based on the HAP subsidy received in 2007, as required by Paragraph C3, *i.e.*, $129,091,869 for Santa Clara and $87,617,964 for San Jose. Gov't App. A14, A15.

For these reasons, the court has determined that Paragraph C4 of Attachment A to the MTW Agreements is not ambiguous.[18] *See* Court Exhibit C.

### 2.   Whether Plaintiffs' Interpretation Of Paragraph C4 Of Attachment A To The Moving To Work Agreements Violates The Relevant Appropriations Acts And Public Policy.

### a.   The Government's Argument.

In the Government's opposition, it contends that Plaintiffs' interpretation of Paragraph C4 does not comply with the applicable Appropriations Acts, that state: "'[PHAs] participating in the

---

[17] "Subsidy" is defined as "a sum of money granted by the government or a public body to assist an industry[.]" NEW OXFORD AMERICAN DICTIONARY at 1735; *see also* BLACK'S LAW DICTIONARY at 1656 (defining "subsidy" as "[a] grant usu[ally] made by the government, to any enterprise whose promotion is considered to be in the public interest"). "Eligibility" is a derivative of "eligible," which is defined as "having the right to do or obtain something[.]" NEW OXFORD AMERICAN DICTIONARY at 562; *see also* BLACK'S LAW DICTIONARY at 634 (defining "eligible" as "[f]it and proper to be selected or to receive a benefit").

[18] At the September 29, 2015 Oral Argument, the Government's Counsel also argued that Paragraph C4 of Attachment A to the MTW Agreements is ambiguous, because the phrases "eligibility," "annual adjustment factor," and "applicable proration factor," are not defined therein. 9/29/15 TR at 17–18. The Government, however, conceded that it failed to raise these arguments previously or in briefing. 9/29/15 TR at 18–19; *see also* 9/29/15 TR at 49 (the court observing that the Government's Counsel appears to have "found more ambiguity in the last few weeks"). It is well established that arguments not raised in the briefs are deemed waived. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (holding that a claim not raised in an opening brief is waived).

[MTW] demonstration shall be funded pursuant to their [MTW] agreements and shall be subject to the same pro rata adjustments' as PHAs not participating in the MTW Program." Gov't Resp. at 29–30 (quoting Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 2414 (2007) ("2008 Act") (authorizing appropriations for the fiscal year ending September 2008). Under Plaintiffs' interpretation they would receive a "compound proration[,] which is something not occurring for PHAs outside of the MTW program[.]" Gov't Resp. at 30 (quoting *Hobbs v. McLean*, 117 U.S. 567, 576 (1886) ("Where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted.")). In sum, "[i]f [P]laintiffs are able to carry forward the 2007 proration of 105.017 percent, then they will be achieving a 'double proration' in any given year, with the 2007 proration being compounded by the proration for that particular year." Gov't Resp. at 37. Therefore, Plaintiffs' interpretation violates the law, because PHAs not participating in the MTW program would not receive this "double proration." Gov't Resp. at 37.

### b.    Plaintiffs' Reply.

Plaintiffs reply that their interpretation of the MTW Agreements does not violate the relevant Appropriations Acts. Pls. Reply at 21. When Plaintiffs joined the MTW program and executed the MTW Agreements in 2008, they were not barred from receiving a HAP subsidy that was greater than the amount received by PHAs that did not participate in the MTW program. Pls. Reply at 21–22. Any subsequent legislation requiring that PHAs be treated equally can only be applied prospectively. Pls. Reply at 22.

As Plaintiffs' Counsel argued, "the Appropriation[s] [Act] says that MTW PHAs 'shall be funded pursuant to the Moving to Work Agreements'" and "[be] subject to the same adjustments made to all other PHA annual budgets based on funding availability. The first step . . . is to calculate the subsidies to which the Plaintiffs . . . [are] entitled . . . pursuant to their MTW [A]greement . . . and then . . . apply the proration factor to that amount." 9/29/15 TR at 61–62. Therefore, Plaintiffs are "being funded just like everyone else." 9/29/15 TR at 62; *see also* Pls. Reply at 22–23.

### c.    The Court's Resolution.

In 2008, Plaintiffs were designated as MTW agencies. *See* 2008 Act, 121 Stat. at 2438 ("The Secretary of [HUD] shall increase, pursuant to this section, the number of [MTW] agencies . . . by making . . . the housing authorities of the count[y] of . . . Santa Clara and the city of San Jose, California, a [MTW] Agency[.]"). This also was the year they entered into the MTW Agreements. Compl. Exs. 1, 2. The 2008 Act governing the February 26, 2008 MTW Agreements provides: "[PHAs] participating in the [MTW] demonstration shall be funded pursuant to their [MTW] agreements and shall be subject to the same pro rata adjustments under the previous proviso." 121 Stat. at 2414. The requirements of the 2008 Act are met, because the February 26, 2008 MTW Agreements provide: (1) the initial year HAP subsidy is determined and each subsequent year; and (2) for adjustments to be made by the "applicable proration factor" for each year's calculation. Therefore, Plaintiffs are "subject to the same pro rata adjustments" as PHAs not participating in the MTW program. *See* 121 Stat. at 2414; *see also* Compl. Ex. 1, at 17 ("For subsequent years, the HAP subsidy will be equal to the previous year's HAP subsidy eligibility adjusted by the current year's AAF and applicable proration factor percentage."); Compl. Ex. 2, at

16 (same).  As such, Plaintiffs' interpretation of Paragraph C4 of Attachment A to the MTW Agreements does not violate the 2008 Act.

It is true that, in 2009, Congress enacted additional legislation that prohibited MTW PHAs from receiving greater funding than PHAs not participating in the MTW program: "No PHA granted this [MTW] designation *through this section* shall receive more funding than they otherwise would have received absent this designation."  Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 981 (2009) ("2009 Act") (emphasis added).  But the 2009 Act and subsequent acts cannot prohibit Plaintiffs from receiving a higher amount of HAP subsidy than non-MTW program PHAs, because that requirement applies prospectively.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) ("The presumption against statutory retroactivity is founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation.").

In the alternative, the Government argues that, even if Plaintiffs' interpretation of Paragraphs C3 and C4 of Attachment A to the MTW Agreements does not violate the Appropriations Acts, it violates public policy.  Gov't Resp. at 36 (citing Restatement § 178 ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.")).  Under the Appropriations Acts, "proration is an annual adjustment applicable to all housing authorities equally.  The fact that the [P]laintiffs are attempting to give themselves special treatment, and reduce other housing authorities' allocations at the same time, should not be countenanced."  Gov't Resp. at 37.

In Oral Argument, the Government admitted that HUD is currently honoring a similar contract with a Minneapolis PHA.  9/29/15 TR at 41–42 (Government's Counsel:  "HUD has provided funding pursuant to [a prorated] dollar amount carried into future years according to the calculation provided for in the agreement.").  Moreover, enforcement of the February 26, 2008 MTW Agreements does not prejudice other PHAs, because they have received their HAP subsidies for 2008 to date under the terms of the MTW agreements they negotiated.  9/29/15 TR at 45.  Finally, in 28 months, Plaintiffs' MTW Agreements will expire.[19]  And, the Government cites no public policy against enforcing a government contract, pursuant to terms negotiated by knowledgeable parties.  Moreover, enforcement of the MTW Agreements, as executed by HUD, is not a windfall to Plaintiffs, because the damages sought for HUD's breach of the MTW Agreements will be used to provide low-income housing to the residents of Santa Clara and San Jose.  9/29/15 TR at 58–59.

For these reasons, the court has determined that Plaintiffs are entitled to summary judgment as to Count II.

---

[19] The term of the February 26, 2008 MTW Agreements is ten years, *i.e.*, from February 26, 2008 through June 30, 2018.  Compl. Ex. 1, at 2; Compl. Ex. 2, at 2.

**IV.      CONCLUSION.**

For the reasons discussed herein, Plaintiffs' September 2, 2014 Motion For Summary Judgment is granted as to Count I and Count II.  *See* RCFC 56(c).  The parties will file a Joint Status Report on damages as to Count I and Count II within sixty days.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

## COURT EXHIBIT A

Housing Choice Voucher Program – CY 2007 HAP Renewal Funding                  Enclosure A

| 1. | HA Number | CA059 |
| 2 | HA Name | COUNTY OF SANTA CLARA HOUSING AUTH. |

**HAP**

| 3 | CY 2006 HAP Costs | $121,280,586 |
| 4 | Mid-Month Additional HAP Costs | $567,694 |
| 5 | Lease-Up HAP For New Units | $0 |
| 6 | Sub-Total – CY 2006 Costs | $121,828,280 |
| 12 | Sub-Total Capped HAP | $121,828,280 |
| 13 | HAP Allowance for Project-Based Vouchers | $0 |
| 15 | Total HAP | $121,828,280 |
| 16 | Annual Adjustment Factor | 1.009 |
| 17 | Inflated Total HAP | $122,924,735 |
| 18 | HAP for Months Not in Sub-Total | $0 |
| 19 | Adjustment for Transfers | $0 |
| 20 | Total Eligibility | $122,924,735 |
| 21 | Pro-Ration Factor | 105.017% |
| 22 | Pro-Rated Funding | $129,091,869 |

**Unit Months**

| 7 | CY 2006 Unit Months Leased | 113,316 |
| 8 | Lease-Up for New Units | 0 |
| 9 | Sub-Total – CY 2006 Leasing | 113,316 |
| 10 | Unit Months Available | 114,216 |
| 11 | Capping Percentage | 100% |
| 14 | Unit Month Allowance for Project Based Vouchers | 0 |

129,091,869 ÷
12 =
10,757,655.75 a

| 23 | Per Unit HAP Cost for New Units in 2007 | $1,079.74 |

24  New Units Effective Between November 1, 2005 and December 1, 2006

| Increment Number | Units | Effective | Expiration | Purpose |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Gov't App. A14.

# **COURT EXHIBIT B**

Housing Choice Voucher Program – CY 2007 HAP Renewal Funding                                   Enclosure A

| | | | |
|---|---|---|---|
| 1 | HA Number | CA056 | |
| 2 | HA Name | SAN JOSE HOUSING AUTHORITY | |

**HAP**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | **Unit Months** | |
| 3 | CY 2006 HAP Costs | $81,821,956 | | 7 | CY 2006 Unit Months Leased | 76,566 |
| 4 | Mid-Month Additional HAP Costs | $299,784 | | | | |
| 5 | Lease-Up HAP For New Units | $0 | | 8 | Lease-Up for New Units | 0 |
| 6 | Sub-Total -- CY 2006 Costs | $82,121,740 | | 9 | Sub-Total-- CY 2006 Leasing | 76,566 |
| | | | | 10 | Unit Months Available | 77,148 |
| 12 | Sub-Total Capped HAP | $82,121,740 | | 11 | Capping Percentage | 100% |
| 13 | HAP Allowance for Project-Based Vouchers | $0 | | 14 | Unit Month Allowance for Project Based Vouchers | 0 |
| 15 | Total HAP | $82,121,740 | | | | |
| 16 | Annual Adjustment Factor | 1.009 | | | | |
| 17 | Inflated Total HAP | $82,860,836 | | | | |
| 18 | HAP for Months Not in Sub-Total | $0 | | | | |
| 19 | Adjustment for Transfers | $0 | | | | |
| 20 | Total Eligibility | $82,860,836 | | | | |
| 21 | Pro-Ration Factor | 105.017% | | | | |
| 22 | Pro-Rated Funding | $87,017,984 | | | | |

$$0 \cdot \% $$
$$87 \cdot 017 \cdot 964 \cdot \div$$
$$12 \cdot =$$
$$7 \cdot 251 \cdot 497 \cdot 00\%$$

| | | |
|---|---|---|
| 23 | Per Unit HAP Cost for New Units in 2007 | $1,078.27 |

24   New Units Effective Between November 1, 2005 and December 1, 2006

| Increment Number | Units | | Effective | Expiration | Purpose |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Gov't App. A15.

## COURT EXHIBIT C

To calculate the 2009 HAP subsidy, the first step under Paragraph C4 is to determine Plaintiffs' 2008 "subsidy eligibility:"

- For Santa Clara, the 2008 "subsidy eligibility" is $129,091,869 (the 2007 HAP subsidy "received") x 2008 AAF.

- For San Jose, the 2008 "subsidy eligibility" is $87,017,964 (the 2007 HAP subsidy "received") x 2008 AAF.

The second step is to multiply the 2008 "subsidy eligibility" by the 2009 AAF and "applicable proration factor:"

- For Santa Clara, the 2009 HAP subsidy is ($129,091,869 x 2008 AAF) x 2009 AAF x 2009 "applicable proration factor."

- For San Jose, the 2009 HAP subsidy is ($87,017,964 x 2008 AAF) x 2009 AAF x 2009 "applicable proration factor."

* * *

Likewise, the 2010 HAP subsidy is calculated the same way. First, determine the 2009 "subsidy eligibility:"

- For Santa Clara, the 2009 "subsidy eligibility" is ($129,091,869 x 2008 AAF x 2009 AAF).

- For San Jose, the 2009 "subsidy eligibility" is ($87,017,964 x 2008 AAF x 2009 AAF).

Then, the 2009 "subsidy eligibility" is multiplied by the 2010 AAF and "applicable proration factor:"

- For Santa Clara, the 2010 HAP subsidy is ($129,091,869 x 2008 AAF x 2009 AAF) x 2010 AAF x 2010 "applicable proration factor."

- For San Jose, the 2010 HAP subsidy is ($87,017,964 x 2008 AAF x 2009 AAF) x 2010 AAF x 2010 "applicable proration factor."

The same equation is used for each subsequent year, 2011 through 2014. Therefore, for every year after 2008, the HAP subsidy includes an amount of money that Plaintiffs were eligible to receive in the previous year, which is based on the HAP subsidy received in 2007.